## RODE & BRAND v. KAMM GAMES, Inc. et al.

No. 198, Docket 21515.

United States Court of Appeals
Second Circuit.

Argued April 4, 1950.

Decided April 21, 1950.

Ernest W. McCormick, of Hartford, Conn. (Lee C. Fielden and Robinson, Robinson & Cole, all of Hartford, Conn., on the brief), for defendants-appellants.

William H. Timbers, of Stamford, Conn. (Walter B. Lockwood and Cummings & Lockwood, all of Stamford, Conn., on the brief), for plaintiff-appellee.

Before AUGUSTUS N. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

This is an appeal from a plaintiff's judgment in an action for damages for breach of a contract for the sale of goods. Plaintiff, a New York corporation engaged in the lithographing business, contracted to sell to defendant Kamm Games, Incorporated, of Connecticut a quantity of novelty baseball games designed by the latter, to be manufactured on lithographed paper of certain specifications which are here in dispute. The second defendant, Raff, a Connecticut citizen, has been held as guarantor for the purchaser. The action is in the diversity jurisdiction of the court, and the district court has found that Kamm Games breached its contract, after certain of the goods had been delivered, by notifying the plaintiff to cease further production for it and by refusing to accept or to pay for any games except those already delivered. In reaching this result the court rejected the defense that the games were not being produced in accordance with the contract.

To set forth the issue, a more detailed statement of facts is necessary. The president of Kamm Games, Al Kamm, is a retired professional baseball player. With his son, Donald Kamm, he organized the defendant corporation in 1946 to produce and sell a novelty baseball game. The corporation quickly became hard pressed for money, and was financed by loans from defendant Raff, an old friend of the Kamm family who became an officer and who signed the orders recited below both individually and as a corporate officer. In June 1947 Kamm had the plaintiff prepare lithograph plates for the games and complete a dozen hand-cut and creased sample games and then 50 additional games by mounting lithographed paper to 65 or 75 point chipboard for a price of $10,600. A point is 1/1000 of an inch in thickness, so that 65 point chipboard (a board made from ground up newspapers, etc.) had a thickness of .065 inches. These games were for display only, since games on this thickness of chipboard were too expensive to market. In September 1947 Kamm had the plaintiff produce 10,000 games by lithographing directly to a 17 point lithofinished Queen Bristol board for a price of 29¢ per game. Some of these games were sold, but even with a coat of varnish to strengthen them they were too flimsy.

In October 1947 in connection with negotiations for a further order the defendants suggested the use of a 30 point claycoated board with a lithofinish on both sides, which they were in a position to furnish promptly. But it appeared that this would be too expensive, and that the work on such material could not be done in time for the Christmas rush. Instead the defendants adopted a suggestion by the plaintiff that 60 pound paper should carry the lithography and be mounted to each side of chipboard, an arrangement which the plaintiff said would have the merit of desired economy and expedition and of greater stiffness in the quality of the completed product than the 17 point board that had been used before.

On October 29, and 31, 1947, defendants gave plaintiff written orders for 110,000 Kamm Baseball Games "to be mounted to 30

point chip." These orders were promptly acknowledged by plaintiff in a written "Acknowledgment of Order" which described the orders as calling for the lithographed sheets "to be mounted to absolute register on 30 point smooth water finished Chip Board." Judge Hincks has found that the language used by defendants—"to be mounted to 30 point chip"—means in the trade that the finished product comprising chipboard, glue, paper, and ink should have an over-all thickness of thirty thousandths of an inch, while the language used by the plaintiff in its acknowledgment, "mounted * * * on 30 point * * * Chip Board" means in the trade that the board itself would have a thickness of 30 points, so that the finished product would have an over-all thickness of 37 or 38 points.

Promptly upon makng the contract the plaintiff ordered from its suppliers 20 point chipboard and began mounting thereto 60 pound lithographed paper sheets. During the month of November 1947 it delivered and defendants accepted 46,100 games. These games had an average thickness of 28½ points, which is within the trade tolerance of 10 per cent if the contract called for a total thickness of 30 points. Defendants made two payments of $5,000 each to plaintiff during November, and on February 2, 1948, made an additional payment of $7,-860.96, completing payment for the 46,100 games that had been delivered.

After several thousand games had been distributed by the defendant corporation to its customers, it learned that it could obtain only 55,000 cartons before Christmas. As a result of this information on November 17, 1947, defendants advised the plaintiff by telephone and letter "to complete run-off of 59,000 games; the balance to be held until further notice." The letter included a check for $5,000 on account and expressed appreciation: "for the prompt manner in which you have handled our order." The plaintiff acceded to this request as well as it could; it completed 17,-400 games in addition to those already delivered; but it made no delivery of these additional games, since the defendants were in arrears in their payments and never, after the letter of November 17, requested or authorized any further deliveries. The defendants never cancelled their contracts with the plaintiff, nor did the plaintiff accept any cancellation. To the contrary, on December 2, 1947, it billed the defendants for the balance claimed to be due under the contract and no part thereof has ever been paid.

The contract price of the games, less the payments on account, the saving to the plaintiff of the cost of manufacture of uncompleted games, and the salvage value of unused materials purchased for the contract, is $19,621.89. The judgment below awards that amount, together with interest from December 2, 1947, of $2,033.16 and costs of $430.59, to the plaintiff.

Defendants' contention on this appeal is that the contract called for games with an over-all thickness of 37 or 38 points, that the games delivered did not comply with these specifications, and that there has thus been, in effect, a failure of consideration and a breach of the contract by plaintiff. Undoubtedly there is force to this argument. The language which defendants used in their orders would mean an over-all thickness of 30 points in the trade, but it might have been understood by a layman as meaning the mounting of the lithographed sheets to chipboard which already had a thickness of 30 points. The language used by the plaintiff in its acknowledgment, however, meant quite clearly that the sheets were to be mounted to 30 point board, and that the over-all thickness was to be 37 or 38 points. It is, as Judge Hincks said, "a curious anomaly that the plaintiff, a firm of large experience in the lithographing field, in its acknowledgment of an order should have used words of trade having a meaning somewhat at variance with its actual intent." But in view of the patent ambiguity in the writings, it is appropriate to look at the surrounding circumstances; and the judge's careful review of these circumstances shows clearly that an over-all thickness of 30 points was intended. Defendants themselves had originally proposed to use a board which would give an over-all thickness of 30 points. Their desire for economy was known to both parties, and to have produced games with the greater thick-

ness would have defeated this desire. Plaintiff's orders to its subcontractor made quite openly, were for 20 point chipboard with the lithographed sheets mounted to an over-all thickness of 30 points. And plaintiff, accustomed to the language of the trade, was entitled to read the defendants' order as calling for an over-all thickness of 30 points; it is hardly likely, therefore, that it would have committed itself to supply a thicker and more expensive board.

These facts in themselves would be convincing of the correctness of the trial court's conclusion that "the contract of the parties, properly interpreted, called for games composed of sheets having an over-all thickness of 30 points and was faithfully performed by the plaintiff save as the plaintiff at the defendants' request withheld performance to mitigate its damages for a breach by the defendants." But there is an additional fact, yet more weighty than those recited, which confirms that conclusion. This is that defendants received, paid for, and distributed to the retail trade thousands of these games without ever once complaining that they did not comply with the terms of the contract. Indeed it was not until this action was instituted, in the fall of 1948, that defendants first raised the objection which they now would have be fatal to the plaintiff's claim. Defendants based their request to stop production on their inability to get cartons in which to distribute more of the games in time for Christmas. They had had ample opportunity to examine the games and determine whether or not they complied with the contract. As Justice Swayne said long ago, "Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law." Ohio & Mississippi Ry. Co. v. McCarthy, 96 U.S. 258, 267, 268, 24 L.Ed. 693. And our court has held, in Vernon Lumber Corp. v. Harcen Const. Co., 2 Cir., 155 F.2d 348, 351, that a party to a contract may not repudiate the contract on one ground and later assert entirely different grounds as a defense for such refusal to perform. It is of course familiar tactics for buyers, caught by a drop in the cost of goods or failure to sell them as planned, to seek some *a posteriori* justification for nonacceptance—compare Comment, Remedies for Total Breach of Contract under the Uniform Revised Sales Act, 57 Yale L.J. 1360, 1363—but the law does not look with favor on this method of avoiding the consequences of unfortunate business ventures.

A like principle is at the basis of § 49 of the Uniform Sales Act which is a part of the controlling Connecticut law. Conn. Gen.Stat.1949 § 6664. That section states that acceptance of the goods by the buyer shall not discharge the seller from liability in damages for breach of warranty, "but if, after acceptance of the goods, the buyer fails to give notice to the seller of the breach of any promise or warranty within a reasonable time after the buyer knows or ought to know of such breach, the seller shall not be liable therefor." The buyer here knew or should have known that the games had an over-all thickness of only 30 points many months before he first raised that objection, so that he is estopped from now complaining that they did not comply with the contract even if—contrary to the views above expressed—his present interpretation of the contract is correct. While the statute does not in terms refer to an acceptance of part of the goods to be delivered under an entire contract, yet it is held to apply where, as here, acceptance of the goods actually delivered suggested the reasonable inference that they were satisfactory. Truslow & Fulle, Inc. v. Diamond Bottling Corp., 112 Conn. 181, 151 A. 492, 71 A.L.R. 1142; and Kirsch v. Coon, 111 Conn. 564, 150 A. 523. And see Restatement, Contracts §§ 300, 412, 1932; 2 Williston on Sales § 467d, 1948 Ed.; 3 *id*. §§ 484a, b.

Hence on the ground that the goods delivered complied with the contract requirements, properly interpreted, and on the further ground that defendants' failure to as-

sert noncompliance within a reasonable time prevents their present reliance on that defense, the judgment below was correct and must be

*Affirmed.*