# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-1736

_____

ACI Worldwide Corporation

*Plaintiff - Appellee*

v.

Churchill Lane Associates, LLC

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Nebraska - Omaha

_____

Submitted: December 9, 2016
Filed: January 27, 2017

_____

Before COLLOTON, BEAM, and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

ACI Worldwide Corporation ("ACI") brought this action seeking a declaratory judgment that it validly amended and terminated a Licensing Agreement, thus ending ACI's obligation to make royalty payments to Churchill Lane Associates, LLC ("Churchill"). Churchill counterclaimed for breach of contract, the district court

granted summary judgment in favor of ACI, and Churchill now appeals. We reverse in part, affirm in part, and remand for proceedings not inconsistent with this opinion.

## I. BACKGROUND

Nestor, Inc. ("Nestor") developed a suite of credit card fraud detection software products called Proactive Risk Management ("PRISM"). In February 2001, Nestor entered into a Licensing Agreement with ACI. The Licensing Agreement allowed ACI to use, modify, enhance, market, sub-license, maintain, and support portions of PRISM ("licensed software technology"). ACI used the licensed software technology to develop new software programs ("new technology"), which ACI licensed to its customers. Per the Licensing Agreement, Nestor owned any new technology developed by ACI. In addition, ACI agreed to pay Nestor periodic royalties, which consisted of fifteen percent of the fees paid by ACI's customers to use the new technology.

The Licensing Agreement is governed by New York law. Section 9.2 of the Licensing Agreement ("termination provision") states that the Licensing Agreement can be terminated unilaterally by one party if the other party becomes insolvent, transfers all of its assets, or otherwise ceases to conduct business. Section 9.3 ("post-termination royalties provision") states that, even after termination, "ACI shall remain liable to Nestor for royalties" with respect to "any sublicenses granted by ACI prior to termination." Section 11.9 ("amendment provision") states that "this Agreement may be amended only by the consent of both parties."

In 2002, Nestor faced financial difficulties and sought to sell its rights to the royalties. For that reason, Nestor and ACI executed Amendment 2 to the License Agreement, which states that "ACI hereby consents to the assignment by Nestor to a third party of the Royalties due Nestor under the Agreement." In order to purchase the rights to the royalties, several Nestor investors formed the entity known as

Churchill. Although ACI also was interested in acquiring the rights to the royalties, Churchill outbid ACI. As a result, Nestor and Churchill executed an agreement entitled Assignment of Royalty Stream in which Nestor irrevocably assigned to Churchill the future royalties due to Nestor under the Licensing Agreement in exchange for $3.1 million. Nestor and Churchill also entered into a Servicing Agreement in which Nestor promised not to modify or terminate the Licensing Agreement without Churchill's consent. ACI received notice of the assignment and began remitting the royalties directly to Churchill.

In 2007, ACI, Nestor, and Churchill executed Amendment 4 to the Licensing Agreement. This amendment served three purposes: establishing foreign currency exchange rates for the royalties; applying Section 3.3 of the License Agreement to Churchill so that ACI would be required to provide Churchill with copies of the software agreements relating to the royalty payments; and requiring Churchill to sign ACI's standard Nondisclosure Agreement. Amendment 4 stated that it was entered into by all three "parties" and that "all terms and conditions set forth in the License Agreement shall remain in full force and effect and shall continue to apply to this Amendment."

In 2008, Nestor and ACI executed Amendment 5 in which Nestor assigned and transferred all of its rights in the new technology to ACI in exchange for $500,000. Notwithstanding this transfer, Amendment 5 clarified that Nestor had "irrevocably" assigned all of its rights in the royalties to Churchill and that "Nestor no longer has any right, title or interest of any nature whatsoever in and to such royalties."

In 2009, Nestor became insolvent and went into receivership. A receiver appointed by the Rhode Island Superior Court sold all of Nestor's rights in the Licensing Agreement and the licensed software technology to American Traffic Solutions ("ATS"). The Asset Purchase Agreement stated that the assets were being sold "free and clear of all Liens." Churchill received notice of this sale and did not

-3-

object.  After the sale, ACI continued to pay royalties to Churchill.  ACI also engaged in discussions with Churchill about acquiring the rights to the royalties, but Churchill declined ACI's offers.

Unable to acquire the rights to the royalties from Churchill, ACI instead purchased from ATS all of Nestor's remaining rights, title, and interest in the licensed software technology and the Licensing Agreement on July 20, 2014.  The following day, ACI unilaterally executed a Termination of License Agreement declaring that "Licensor and Licensee hereby terminate the License Agreement as of the Effective Date and agree that all provisions of the License Agreement that were designated to survive termination are likewise terminated as of the Effective Date."[1]  Several weeks later, ACI sent Churchill a letter stating that "the license agreement, including the royalty obligations assigned to Churchill Lanes, is no longer in effect."  ACI also enclosed a check representing the "full and final payment" for the balance of royalties due.  Churchill did not consent to the termination, and it informed ACI that it believed it was still entitled to further royalties.

On October 20, 2014, ACI filed this diversity action in federal court, seeking a declaratory judgment that it validly terminated the Licensing Agreement and that it owed no further royalties to Churchill.  Churchill responded that ACI could not amend or terminate the Licensing Agreement without Churchill's consent because Churchill was a party to the Licensing Agreement, and even if Churchill was not a party, it was at least a third-party beneficiary.  Churchill also counterclaimed for royalties due under the Licensing Agreement.  Churchill filed a motion for partial summary judgment, and ACI filed a motion for summary judgment.

---

[1]Consistent with the positions of both parties throughout this litigation, we treat this clause as both a purported amendment and a purported termination of the Licensing Agreement.

-4-

The district court denied Churchill's motion and granted summary judgment in favor of ACI. The court held that, due to the terms of Amendment 4, which was signed by all three parties, Churchill was "a party to the agreement in some capacity." *ACI Worldwide Corp. v. Churchill Lane Assoc., LLC*, No. 8:14CV249, 2016 WL 5107137, at *7 (D. Neb. Mar. 9, 2016). Nevertheless, the court held that Churchill had only those rights intended by Amendment 4, which did not include retroactively making Churchill a full party to the Licensing Agreement or the amendment provision specifically. *Id.* On that basis, the court held that "Churchill's permission was not needed to amend the Licensing Agreement." *Id.* Thus, the court concluded that ACI "validly amended the Licensing Agreement, eliminating the obligation to pay post-termination Royalties on sublicenses." *Id.* at *8. The court further held that ACI validly terminated the Licensing Agreement pursuant to the termination provision because Nestor had become insolvent. *Id.* at *9-10. Churchill now appeals.

## II. DISCUSSION

Churchill argues that (1) ACI's amendment of the Licensing Agreement to eliminate the post-termination royalties provision is invalid, and (2) ACI's termination of the Licensing Agreement is invalid. If ACI's amendment is invalid, then ACI will continue to owe Churchill royalties on any sublicenses granted before the alleged termination date of July 21, 2014. If ACI's termination also is invalid, ACI will continue to owe royalties on any sublicenses it has granted since the alleged termination date and that it will grant in the future. We review *de novo* the grant of summary judgment for ACI, viewing the facts in the light most favorable to Churchill. *See McPherson v. O'Reilly Auto., Inc.*, 491 F.3d 726, 730 (8th Cir. 2007).

### A. Amendment of the Licensing Agreement

ACI responds that its amendment of the Licensing Agreement to eliminate the post-termination royalties provision was valid for several reasons. First, ACI

contends that Churchill possessed only the limited rights identified in Amendment 4, which did not include making Churchill a full party to the entire Licensing Agreement such that any future amendments would require its consent. Second, ACI contends that Churchill is not entitled to the protections of a third-party beneficiary or assignee because Churchill had only the rights specified in Amendment 4 and because any remaining rights were extinguished by the receivership sale of Nestor's assets to ATS. Third, ACI contends that even if Churchill retains any rights, those rights are only to royalties "due to" the licensor, and because the licensor and licensee interests have merged in ACI, royalties are no longer "due to" either the licensor or Churchill.

Although we agree with ACI and the district court that Amendment 4 did not have the effect of retroactively making Churchill a full party to the License Agreement, we do not agree that either Amendment 4 or the receivership sale prevents Churchill from exercising the legal rights of a third-party beneficiary or assignee. We also do not agree with ACI that the doctrine of merger prevents additional royalties from becoming due to Churchill. Therefore, we conclude that ACI did not validly amend the Licensing Agreement to eliminate the post-termination royalties provision, and royalties are still due to Churchill for any sublicenses granted by ACI prior to July 21, 2014.

*1. Full-Party Status*

Churchill argues that it became a full party to the Licensing Agreement by virtue of Amendment 4 because it was entered into by all three "parties"—Nestor, ACI, and Churchill—and it declared that "all terms and conditions set forth in the License Agreement shall remain in full force and effect and shall continue to apply to this Amendment." Under New York law, "[t]he modification of a contract results in the creation of a new contract between the parties which *pro tanto* supplants the affected provisions of the original agreement while leaving the balance of it intact." *Cappelli v. State Farm Mut. Auto. Ins. Co.*, 259 A.D.2d 581, 582 (N.Y. App. Div.

1999).  Thus, according to Churchill, because it was a party to Amendment 4, it was also a party to the Licensing Agreement, and all of the terms of the original agreement, including the amendment provision, apply to Churchill.

However, the mere presence of Amendment 4 does not make Churchill a full party to the Licensing Agreement.  As the district court recognized, New York law "does not suggest that a new party is retroactively conferred with all the rights and obligations of other parties in the original agreement when, as here, the terms of the contract and its amendments, read together, unambiguously reveal that the parties intended otherwise."  *ACI*, 2016 WL 5107137, at \*7.  Indeed, if the parties had intended for Churchill to become a full party to the License Agreement, they could have expressly stated as much in Amendment 4.  Instead, Amendment 4 states only that Section 3.3 of the License Agreement will apply to Churchill and does not mention other provisions.  This omission suggests that the parties did not intend to modify the Licensing Agreement to apply all provisions to Churchill.  *See Mary Matthews Interiors, Inc. v. Levis*, 208 A.D.2d 504, 506 (N.Y. App. Div. 1994) ("A 'modification agreement [leaves] intact . . . those provisions of the original agreement which were not expressly or impliedly supplanted.'") (alteration in original) (quoting *Tejani v. Allied Princess Bay Co.*, 204 A.D.2d 618, 620 (N.Y. App. Div. 1994)).  Furthermore, if Churchill became a full party to the Licensing Agreement, many of the provisions referring only to the rights of two parties would make little sense.  For example, the amendment provision states that "this Agreement may be amended only by the consent of both parties."  Also, Section 11.8, which concerns where notices may be sent, lists only the names and addresses of Nestor and ACI.  Hence, as far as express contractual rights are concerned, Churchill possesses only those rights identified by Amendment 4.  Therefore, Churchill was not a full party to the entire Licensing Agreement.[2]

---

[2]Churchill also argues that ACI made a binding judicial admission that Churchill was a party to the Licensing Agreement when ACI's complaint alleged that

## 2. Third-Party Beneficiary and Assignee Status

Churchill argues that, even if the district court was correct to hold that Churchill was a party to the License Agreement only for limited purposes, Churchill is at least a third-party beneficiary for all other purposes. Under New York law, "an intended beneficiary of a contract may maintain an action as a third party." *Alicea v. City of New York*, 145 A.D.2d 315, 317 (N.Y. App. Div. 1988). To maintain such an action, the third party must establish: "(1) the existence of a valid and binding contract between other parties, (2) that the contract was intended for his benefit and (3) that the benefit to him is sufficiently immediate, rather than incidental, to indicate the assumption by the contracting parties of a duty to compensate him if the benefit is lost." *Burns Jackson Miller Summit & Spitzer v. Lidner*, 451 N.E.2d 459, 469 (N.Y. 1983).

Churchill asserts that the amendments to the Licensing Agreement show that Churchill was a third-party beneficiary because, after these amendments, ACI's obligation to pay royalties was owed to Churchill rather than Nestor. Moreover, ACI recognized this obligation by paying the royalties directly to Churchill from 2002 to 2014. Indeed, "where the performance is rendered directly to a third party, that party is generally considered an intended beneficiary of the contract." *Alicea*, 145 A.D.2d at 318. Thus, ACI's actions suggest that Churchill may be characterized as a third-party beneficiary of the Licensing Agreement.

However, we note that Churchill may be better characterized simply as an assignee of Nestor's rights to the royalties. "When a valid assignment is made, the

Churchill consented to personal jurisdiction "pursuant to the ACI License Agreement." However, as the district court recognized, this claim regarded only personal jurisdiction and did not constitute "a binding admission that Churchill incurred other rights and obligations under the Licensing Agreement." *ACI*, 2016 WL 5107137, at *7 n.10.

assignee steps into the assignor's shoes and acquires whatever rights the latter had." *In re Stralem*, 303 A.D.2d 120, 123 (N.Y. App. Div. 2003). "No particular words are necessary to effect an assignment; it is only required that there be a perfected transaction between the assignor and assignee, intended by those parties to vest in the assignee a present right in the things assigned." *Leon v. Martinez*, 638 N.E.2d 511, 513 (N.Y. 1994). Accordingly, Churchill and Nestor effected a valid assignment when they executed the Assignment of Royalty Stream, which stated that "the Assignor irrevocably sells, transfers, conveys and assigns . . . to the Assignee, and the Assignee irrevocably purchases from the Assignor, all Royalties."

Regardless of whether Churchill is characterized as a third-party beneficiary or as an assignee, the same legal protection applies: once ACI had notice of the assignment and began to remit the royalties to Churchill, neither ACI nor Nestor could prejudice Churchill's rights to the royalties without Churchill's consent. *See Barnum v. Millbrook Care Ltd. P'ship*, 850 F. Supp. 1227, 1236 (S.D.N.Y. 1994) ("[T]he parties to an agreement may subsequently modify the agreement even without the consent of the creditor beneficiary as long as the creditor beneficiary has not accepted, adopted or relied upon the original agreement."); *Poughkeepsie Sav. Bank v. R & G Sloane Mfg. Co.*, 84 A.D.2d 212, 217 (N.Y. 1981) ("[A]n assignee of a chose in action . . . who has given notice of the assignment [to the debtor], is not liable to be prejudiced by any new dealings between the original parties to the contract.") (quoting *Myers v. Davis*, 22 N.Y. 489, 491 (1860)). This rule is best illustrated by *Poughkeepsie Savings Bank v. R & G Sloane Manufacturing Co.*. There, a landlord delivered an assignment of rents to a bank, the tenant began remitting its rental checks to the assignee bank, and the landlord and tenant agreed to cancel the lease in exchange for the payment of $30,000 to the landlord. *Poughkeepsie*, 84 A.D.2d at 213. The court held that once "the tenant has been given notice of the assignment, the landlord and tenant cannot agree to cancel the lease without the consent of the assignee, and such an agreement is ineffective to impair the assignee's rights." *Id.* at 216. Here, as in *Poughkeepsie*, Churchill acquired the

legal protections of a third-party beneficiary or assignee when ACI received notice of the assignment and began remitting royalties to Churchill. As a result, ACI could not thereafter impair Churchill's rights by amending the post-termination royalties provision without Churchill's consent.

ACI responds that Churchill is not entitled to such protections for two reasons. First, ACI argues that, because the parties expressly addressed Churchill's rights in Amendment 4 and because Churchill did not negotiate the right to consent to amendments, there is no need to "enhance Churchill's rights by operation of law." Hence, ACI attempts to distinguish *Poughkeepsie* on the basis that the bank was a "complete stranger" to the lease and had not "passed" on rights to consent or receive notice of changes. Indeed, the district court seemed to subscribe to this theory when it determined that, because it found that Churchill was a limited party rather than a nonparty, "it need not consider Churchill's alternative argument that, if not a party, it was a third-party beneficiary to the Licensing Agreement." *ACI*, 2016 WL 5107137, at *7 n.9.

However, although ACI argues against *enhancing* Churchill's rights, ACI fails to recognize that Churchill acquired such rights in 2002 and that it is effectively arguing that Amendment 4 *reduced* those rights. Yet, ACI and the district court cite no legal authority suggesting that an assignee of rights loses its legal protections whenever the assignee and the original parties form a new agreement regarding ancillary matters and neglect to reduce to writing all of the legal protections that the assignee previously acquired. Rather, just as the silence of Amendment 4 could not modify the Licensing Agreement to grant Churchill full-party status, it likewise could not modify Churchill's then-existing legal rights. *Cf. Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 585 (2d Cir. 2006) ("Because waiver of a contract right must be proved to be intentional, the defense of waiver requires a clear manifestation of an intent by plaintiff to relinquish her known right and mere silence, oversight or thoughtlessness in failing to object to a breach

-10-

of the contract will not support a finding of waiver.") (quotations omitted). Therefore, Churchill acquired the legal protections of either a third-party beneficiary or assignee in 2002, and we see no reason to conclude that Amendment 4 eliminated those protections in 2007.

Second, ACI contends that whatever protections Churchill received as a third-party beneficiary or assignee were extinguished by the receivership sale to ATS in 2009. ACI claims that "Churchill lost contractual rights during the receivership action" because "the receivership court entered a final order cancelling all agreements affecting the License Agreement and the PRISM technology (save only those listed on [the schedule of assumed executory contracts]) and approving the sale of all of Nestor's assets free and clear of claims and unassumed contracts." Thus, according to ACI, because neither the Assignment of Royalty Stream nor the Servicing Agreement were listed on the schedule of assumed executory contracts and because Churchill did not object to this omission, the receivership action "expressly cancelled the applicable agreements." According to this view, Churchill had no valid assignment at all following the sale.

However, the receivership court's order did not, in fact, expressly cancel any agreements not listed on the schedule of Assumed Executory Contracts. Rather, the order noted only that any contracts not listed on that schedule were "expressly not assumed by Purchaser." Although the Assignment of Royalty Stream and Servicing Agreement were not listed on the schedule of assumed executory contracts, the Licensing Agreement was listed, and the amendments to that agreement declare that Nestor irrevocably assigned the royalties to Churchill. ACI cites no legal authority to support the proposition that a receivership sale "free and clear" of all liens can eliminate the legal protections of an assignee when the assignment is announced in a contract surviving the receivership action. Moreover, Churchill did not consent to any loss of assignee rights by failing to object to the receivership sale. *See Excelsior Capital, LLC v. Superior Broad. Co.*, 101 A.D.3d 670, 672 (N.Y. App. Div. 2012)

-11-

("[M]ere silence or failure to consent is insufficient, standing alone, to establish consent.").

Therefore, we find that the receivership sale to ATS did not eliminate Churchill's assignment or its rights as a third-party beneficiary or assignee. The fact that ACI continued to remit royalties directly to Churchill even after the receivership sale underscores this finding. Because Churchill maintained these rights, ACI could not eliminate the post-termination royalties provision without Churchill's consent.

### 3. Doctrine of Merger

ACI argues that even if it did not validly amend the Licensing Agreement, ACI's obligation to pay further royalties ceased on July 21, 2014, when ACI acquired from ATS all of Nestor's remaining rights as licensor. According to ACI, when this occurred, ownership of the licensor and licensee interests merged in ACI. Thus, Churchill was no longer entitled to royalties because Churchill had been assigned only the right to receive royalties "due to" the licensor, and the licensor had been extinguished through merger.

In the context of real property, New York courts consistently apply this doctrine of merger to extinguish easements when the title in fee to both the dominant and servient estates becomes vested in one person. *See Will v. Gates*, 680 N.E.2d 1197, 1200 (N.Y. 1997) ("The merger doctrine proceeds from a recognition that a person cannot have an easement in his or her own land because all the uses of an easement are fully comprehended in the general right of ownership.") (citations omitted). However, this doctrine has not previously been applied to intellectual-property licenses. *See In re Lockwood*, 414 B.R. 593, 599 n.8 (Bankr. N.D. Cal. 2008) (finding "no case authority indicating that the doctrine of merger applies to licenses and patents and other intellectual property").

-12-

Furthermore, even in the real property context, "[t]he doctrine of merger has never been favored in equity," and estates will not merge when doing so would impair "some intervening right or equity in a third person." *Dunkum v. Maceck Bldg. Corp.*, 176 N.E. 392, 394 (N.Y. 1931). Indeed, at least one court has denied a merger when it would have eliminated the rights of an assignee. In *Trustees of Conquistador Council Boy Scouts Trust Fund v. International Minerals & Chemical Corp.*, a landlord assigned rental payments to an assignee, the tenant bought the property from the landlord, and the tenant ceased paying rent on the ground that the leasehold merged into the fee simple. 570 P.2d 593, 594 (N.M. 1977). Nevertheless, the court held that "the doctrine of merger does not apply to extinguish the lesser (leasehold) estate when the lessee acquires the greater estate (fee), when to so apply the doctrine would prejudice the rights of an innocent third party." *Id.* at 595.

ACI responds that Churchill would not be prejudiced by such a merger because "Churchill did not receive a promise to be paid a sum certain each month." Rather, Churchill was assigned only the right to be paid what becomes due to Nestor each month, and Churchill assumed the risk that nothing could become due to Nestor. However, although Churchill may have assumed the risk of no royalties becoming due based on the terms of the Licensing Agreement, nothing suggests that Churchill assumed the risk of ACI acquiring Nestor and eliminating the licensor interest altogether. Indeed, the court in *Conquistador* did not rest its holding on the fact that the lease may have been for a sum certain each month. Rather, the court held that allowing a lessee to extinguish an assignment by purchasing the lessor's interest "would result in rendering extinct and worthless many assignments and pledges of rentals made to third persons in a wide variety of business and financial transactions." *Id.*

Therefore, we decline to hold that the doctrine of merger applies in this context. Because merger does not apply, the licensor and licensee interests do not

-13-

merge, and thus royalties are still due to Churchill for all sublicenses granted prior to the alleged termination date.

## B. Termination of the Licensing Agreement

Even though ACI's amendment of the Licensing Agreement is invalid, that does not necessarily mean that ACI's termination is likewise invalid. In fact, ACI's termination of the Licensing Agreement is valid because, unlike ACI's purported amendment, the termination does not impair Churchill's rights. This conclusion follows from the rule that "an assignee takes no greater right than that of his assignor." *Poughkeepsie*, 84 A.D.2d at 218 (quotation omitted). Thus, in *Poughkeepsie*, the assignee bank's consent was required to cancel the lease agreement only because the assignor landlord's consent was required for such an action. *See id.* at 217 ("[A]n assignee . . . is not liable to be prejudiced by any new dealings between the original parties to the contract.") (quotation omitted). Likewise, Churchill's consent was required to amend the post-termination royalties provision only because Nestor's consent would have been required for such a modification. In contrast, under the terms of the termination provision, Nestor's consent was not required for ACI unilaterally to terminate the Licensing Agreement once Nestor became insolvent. Consequently, if Churchill could prevent ACI from terminating the agreement based on Nestor's insolvency, Churchill would hold even greater rights as an assignee than Nestor held as an original party to the Licensing Agreement. Therefore, allowing ACI to terminate the Licensing Agreement based on the termination provision does not impair Churchill's rights.

Indeed, Churchill concedes that Nestor's insolvency and receivership satisfied the conditions listed in the termination provision and would have allowed ACI to terminate the Licensing Agreement in 2009 without the consent of either Nestor or Churchill. However, Churchill provides three reasons why ACI's termination in 2014 is invalid.

-14-

First, Churchill argues that ACI's termination is invalid because it is barred by the election of remedies doctrine. This doctrine states that "[o]nce a party elects to continue [a] contract, he can never thereafter elect to terminate the contract based on that breach." *Bigda v. Fischbach Corp.*, 898 F. Supp. 1004, 1011-12 (S.D.N.Y. 1995). Churchill argues that because ACI elected to continue paying royalties, ACI is precluded from terminating the License Agreement in 2014 based on Nestor's acts in 2009. However, the election of remedies doctrine applies only to a party's decision to continue performing a contract following a breach of that contract. *See AM Cosmetics, Inc. v. Solomon*, 67 F. Supp. 2d 312, 317 (S.D.N.Y. 1999) ("[I]f one party to a contract materially breaches the contract during the course of a continuing performance, the injured party has two options: he may terminate the contractual relations at that time or he may choose to continue performance under the contract despite that breach."). Nestor's insolvency and receivership did not constitute a breach of the Licensing Agreement. *See Hanna v. Florence Iron Co. of Wisc.*, 118 N.E. 629, 630 (N.Y. 1918) ("Mere insolvency of one of the parties to a contract does not relieve the other party from performance thereof and would not excuse the refusal of [a party] to carry out its contract."). Rather, insolvency was a condition allowing ACI to terminate the Licensing Agreement. Accordingly, the election of remedies doctrine does not render ACI's termination invalid.

Second, Churchill argues that ACI's termination is invalid because ACI notified Churchill that it was terminating the Licensing Agreement based on its status as licensor and licensee rather than Nestor's insolvency. Churchill asserts that "ACI cannot terminate a contract for one reason and then later assert in litigation it was entitled to terminate for another reason." However, this doctrine is "based on equitable estoppel." *G. Amsinck & Co. v. Springfield Grocer Co.*, 7 F.2d 855, 860 (8th Cir. 1925). Equitable estoppel requires "a representation by the party estopped which misleads, and an innocent and deleterious change of position in reliance upon that representation." *Williams v. Neely*, 134 F. 1, 11 (8th Cir. 1904). Thus, the cases cited by Churchill correctly hold that the defendants could not justify termination on

-15-

one basis and then later assert a breach of contract as a different basis, but that is because the plaintiffs could have remedied the breach if the defendants had originally cited the breach as the reason. *See Date Sys. of New Jersey v. Philips Business Sys.*, No. 78 Civ. 6015-CSH, 1986 WL 733, at \*1, \*6-7 (S.D.N.Y. Jan. 6, 1986); *Rode & Brand v. Kamm Games, Inc.*, 181 F.2d 584, 587 (2d Cir. 1950). Here, even if ACI originally cited Nestor's insolvency as the reason for termination, Churchill could not have remedied a breach or prevented ACI from legally terminating the Licensing Agreement. Therefore, ACI's failure to specify the correct legal justification does not render its termination invalid.

Third, Churchill and the dissent argue that ACI could not validly terminate the License Agreement because Nestor was no longer a "party" to the agreement as of 2014 because it previously transferred all of its remaining interests in the agreement in 2009. According to Churchill, the termination provision allows for termination only if a "party" becomes insolvent or meets one of the other conditions listed in the provision. Hence, when ATS "replaced Nestor as licensor in 2009," Nestor was no longer a "party," and so its insolvency had no bearing on ACI's right to terminate the Licensing Agreement.

However, although it may be true that Nestor was no longer a party to the agreement following its insolvency, that does not mean that its insolvency had no bearing on ACI's rights under the termination provision. The termination provision allows one party unilaterally to terminate the Licensing Agreement if "the other party . . . becomes insolvent or assigns all, or substantially all, of its assets." It does not state that "the other party" must remain a party to the agreement after insolvency or assigning all of its assets. Indeed, according to Churchill, Nestor ceased to be a "party" precisely because it assigned all of its assets to ATS. But if Nestor also ceased to be "the other party" for purposes of this provision upon assigning all of its assets, then ACI would have no window of opportunity to terminate the Licensing Agreement on that basis. Thus, the termination provision would be rendered

-16-

meaningless.  Because we should "avoid an interpretation that effectively renders meaningless a part of the contract," *Helmsley-Spear, Inc. v. N.Y. Blood Ctr., Inc.*, 257 A.D.2d 64, 69 (N.Y. App. Div. 1999), we reject Churchill's argument that ACI could terminate the agreement only while Nestor remained a "party."  Rather, we believe that the termination provision authorized ACI to terminate the agreement if Nestor became insolvent or assigned its assets while it was a party to the agreement. Because Nestor still was a party to the agreement in 2009 when it became insolvent, ACI was entitled to terminate the agreement.

Therefore, ACI validly terminated the License Agreement in accordance with the termination provision.  As a result, ACI does not owe Churchill royalties on any sublicenses that ACI has granted since July 21, 2014 or that it will grant in the future. However, because the post-termination royalties provision was not validly amended prior to termination, ACI continues to owe Churchill royalties on any sublicenses granted before July 21, 2014.

### III. CONCLUSION

For the foregoing reasons, we reverse the entry of summary judgment in favor of ACI on the issue of amendment of the Licensing Agreement, affirm the entry of summary judgment in favor of ACI on the issue of termination, and remand to the district court for further proceedings not inconsistent with this opinion.


BEAM, Circuit Judge, concurring in part and dissenting in part.


I concur in the court's reversal of the district court's entry of summary judgment in favor of ACI and in the court's collateral ruling that ACI continues to owe Churchill royalties accruing from all sublicenses granted prior to July 21, 2014.  I

-17-

dissent from the court's holding that ACI validly terminated Churchill's continuing interest in the Licensing Agreement on July 21, 2014.

I agree with the district court and Churchill that Churchill became a party to the Agreement in 2007 when, due to financial difficulties, Nestor entered into Amendment 4 of the Agreement with ACI and Churchill. At that time, Churchill acquired all of Nestor's past, present and future technology-based royalty stream, and, at least by enforceable implication, Nestor's prerogatives in the technology that generated such royalties. In addition, without question, Churchill gained the right to enforce the receipt of royalty assets due from past, present and future ACI-founded sublicenses.

Under the terms of Amendment 4, ACI acquiesced in this newly formed tripartite relationship and submitted sublicense royalty collections previously due Nestor directly to Churchill. As a result, Churchill contends, correctly, that ACI, in its pleadings, concedes that Churchill became a party to the Licensing Agreement. Accordingly, subsequent to Amendment 4, the parties to the Licensing Agreement were Nestor, ACI and Churchill.

The court notes that in 2008, Nestor and ACI executed Amendment 5 through which Nestor transferred all of its rights in any "new" technology to ACI. Ante at 3. The court also correctly states, pursuant to Amendment 5, that "[n]otwithstanding this transfer . . . Nestor had [in 2002] 'irrevocably' assigned all of its rights in the royalties to Churchill and that 'Nestor no longer has any right, title or interest of any nature whatsoever in and to such royalties.'" Ante at 3. This amendment assignment had to have included royalties emanating from the use of the new technology as agreed upon at the outset of the Nestor-ACI relationship in 2001. So, subsequent to that point in time, and especially on July 21, 2014, the Licensing Agreement, as relevant to this action, was totally dedicated to the matter of royalties owed by one party to another party.

-18-

The court mentions, but fails to adequately discuss, the implications surrounding Nestor becoming insolvent in 2009. At that time, the Rhode Island Superior Court appointed an insolvency receiver. The receiver, as authorized by the court, sold "all of Nestor's [still continuing] rights in the Licensing Agreement and the licensed software technology to [ATS]." Ante at 3. Indeed, the Asset Purchase Agreement states that the assets were being sold "free and clear of all Liens." Ante at 3. At that time, ATS was wholly substituted for Nestor as a party to the Licensing Agreement by action of the Rhode Island court which by law exercised exclusive jurisdiction over Nestor's property. See Rhode Island General Laws § 7-1.2-1316(f). Thus, the parties to the Licensing Agreement at that time consisted of Churchill, ACI and ATS.

The court then observes that, "[u]nable to acquire the rights to the royalties [that were earlier irrevocably assigned as noted in Amendment 5] from Churchill, ACI instead purchased from ATS all of Nestor's remaining rights, title, and interest in the licensed software technology and the Licensing Agreement on July 20, 2014." Ante at 4. This purchase did not include any Nestor royalty rights because the receiver had none to sell. In any event, the parties to the Licensing Agreement then became ACI and Churchill. The next day ACI, armed with whatever rights it had earlier owned or had then been acquired from the receiver, unilaterally purported to execute a termination notice to Churchill, although with a later letter stating, "the license agreement, including the royalty obligations assigned to Churchill Lanes, is no longer in effect." It appears that no specific contractually required reasons for a termination were ever advanced by ACI.

This purported termination notice was actually an attempted unilateral amendment of the Licensing Agreement and is so recognized by the court and both ACI and Churchill. See ante at 4 n.1. And, in this regard, the Agreement recognizes as the only grounds potentially applicable here for a termination of a "party" (1) becoming insolvent, (2) transferring of all its assets or (3) ceasing to conduct

-19-

business. ACI's cancellation of the License Agreement's royalty obligations fully assigned to Churchill is not one of these applicable grounds for unilateral termination. Thus, ACI's above-stated unilateral amendment attempt designed to obtain Nestor's long since assigned royalty rights was ultra vires in the extreme.

To repeat, and as the court concedes, a unilateral termination could be bottomed only on an allegation that the other party has become insolvent, transferred all of its assets, or has otherwise ceased to conduct business. Ante at 2. And, the record clearly establishes that Nestor, as Churchill correctly contends, was no longer a party to the Agreement at the time ACI rendered its termination notice. If, however, ACI somehow seeks to support a termination claim based upon Nestor's rights and assets purchased from ATS, the License Agreement language and prior transactions between these existing parties to the Agreement clearly prohibit such a result.[3]

Section 9.3, the post-termination royalties provision, provides that even after termination, ACI shall remain liable to Nestor for royalties with respect to sublicenses granted by ACI prior to termination. Without question Churchill acquired all Nestor's royalty rights well before ATS purchased any rights, title or interest from the receiver or before ACI purported to acquire them and render its specious termination notice.

Section 11.9 states this Agreement may be amended only by the consent of both parties. At this time, that would be ACI and Churchill. ACI's purported termination notice is clearly a unilateral contract amendment and it seeks to function as such. And, as earlier noted, Churchill paid Nestor $3.1 million for all future royalties due Nestor under the Licensing Agreement and Churchill and Nestor entered

_____

[3]For instance, Section 9.2 of the termination provision states "[e]ither party may *immediately* terminate this Agreement . . . if the other party . . . becomes insolvent." It is difficult to believe that ACI's purported termination coming more than seven years subsequent to Nestor's insolvency can be deemed either "immediate," or equitable.

-20-

into an agreement at that time whereby Nestor promised not to modify or terminate the Licensing Agreement without Churchill's consent. <u>Ante</u> at 3. ACI's purported termination based upon acquisition of ATS's receivership purchases breach the underlying Agreement from which ACI now seeks to benefit.

Churchill is entitled to a calculable stream of licensing royalties emanating from Nestor, ACI and Churchill sources on and after July 21, 2014. From the court's contrary holding, I dissent.

_____