# United States Court of Appeals
## For the Eighth Circuit

_____

No. 19-2612

_____

David T. Russell

*Plaintiff - Appellant*

v.

Edward R. Anderson

*Defendant - Appellee*

_____

Appeal from United States District Court
for the District of Nebraska - Lincoln

_____

Submitted: May 13, 2020
Filed: July 15, 2020

_____

Before COLLOTON and BENTON, Circuit Judges, and WILLIAMS,[1] District
Judge.

_____

BENTON, Circuit Judge.

---

[1]The Honorable C. J. Williams, United States District Judge for the Northern
District of Iowa, sitting by designation.

David T. Russell sued Edward R. Anderson for negligently crossing the highway's center line and sideswiping Russell's motorcycle. A jury awarded Russell $7,000. The district court denied his motion for a new trial on damages. ***Russell v. Anderson***, 2019 WL 3358702, at \*3 (D. Neb. July 25, 2019). He appeals. Having jurisdiction under 28 U.S.C. § 1291, this court affirms.

## I.

This court views "the evidence in the light most favorable to the jury verdict, assuming as true all facts which the prevailing party's evidence tended to prove." ***Patterson v. City of Omaha***, 779 F.3d 795, 801 (8th Cir. 2015) (upholding denial of new trial because jury's award of nominal damages was consistent with evidence viewed most favorably to the verdict) (cleaned up).

About 9:30 pm on August 9, 2013, Anderson's car crossed the center line and sideswiped Russell's motorcycle approaching from the opposite direction. Russell stayed on his motorcycle, stopping in a ditch on the side of the road. He testified he restarted the motorcycle, got it back into gear, drove out of the ditch, and stopped near the collision scene. He was not bleeding and at the time, he did not think anything was broken. He testified, "I actually kind of patted myself down and thought, 'Well, I think I'm alright.'" His right arm and neck were "really numb." According to Russell, Anderson said, "Glad you're okay." Russell replied, "I'm glad you're okay, too."

Russell's fellow motorcycle riders, Nick Hargis and Garret Sherman, rode ahead until they noticed he was no longer with them. Sherman testified they returned to find Russell standing on the side of the road acting "pretty hysterical," "throwing his arms up and down," "pacing around" waiting for police to arrive.

Sheriff David C. Weeks, Anderson's longtime friend, responded to the collision. He had known Anderson since he was a child and saw him once a week for coffee.

Weeks testified he saw some scratches along the side of Russell's motorcycle, but recalled no other damage. He did not see any injuries on Russell, who "seemed normal." Weeks did not call an ambulance because Russell "said he . . . was not injured enough for any treatment." Russell told him only, "I may have hurt my arm a little bit." Weeks testified that if Russell's injuries had impaired his driving ability, Weeks "wouldn't have let him drive." Nor would he have let Russell drive an inoperable motorcycle away from the scene.

According to Russell, himself a licensed emergency medical technician, they did not call an ambulance because "I didn't feel, at the time, that I needed one." He said, "I knew I was going to be sore. I didn't know I'd be that sore, but I thought I'd get better."

A few hours after the collision, preparing to leave the scene, Russell was unsure his motorcycle could be ridden. Sherman, a mechanic, after riding it about 200 feet, said, "No, it's fine. You'll be alright." They did not repair the motorcycle. Russell rode it about 50 miles to a hotel with Sherman and Hargis. Sherman did not recall Russell complaining of injuries that night.

According to Russell, the next morning he felt "pretty sore" and "stiff." He took painkillers and decided to ride the motorcycle home to Kansas City, a four-hour drive. He did not repair it beforehand, although it had a bent rotor. During the trip, Hargis and Sherman did not see Russell having "any problems operating his bike." Sherman did not recall him asking to take a break.

Two days after the collision, Russell claimed to be "a lot sorer." The next day he saw a chiropractor, and had an MRI six days after the collision. A few weeks later, he saw an orthopedic surgeon, who recommended physical therapy. He also saw several neurologists. He had neck surgery on his spinal cord on January 6, 2014, five months after the collision. He had right shoulder surgery in December 2014. Russell

testified he still had symptoms from his neck injury, including pain, weakness in extremities, and "burning feet," and was still doing physical therapy. He estimated his past medical bills at over $227,000. He expected another neck surgery, which his expert estimated would cost $80,000 to $90,000.

Russell's expert, Dr. Truett L. Swaim, conducted an independent medical evaluation but did not treat him. Swaim explained that the neck MRI taken six days after the collision showed "a really bad disc herniation." Russell would have "potential long-term damage" in the form of "permanent nerve injury." Swaim believed the MRI "shows that it's within a reasonable degree of medical certainty he had a significant flexion injury to his neck at some point in time." His report also noted that a physician's assistant observed the "fresh" neck disc herniation in the MRI six days after the collision.

Anderson stipulated that Russell had a disc herniation in his neck "that necessitated surgery" but disagreed "about the cause of it."

Swaim testified that "where someone gets in an accident, you've got endomorphins that are released at the same time. . . . like, your body's morphine." He explained that endomorphins could prevent someone from feeling pain until a day or two after being injured. Swaim testified that the "likelihood" of the collision causing Russell's "large" neck disc herniation was "extremely high" because the MRI was taken a few days afterward. The court commented to the jury that the question of causation was ultimately up to them.

According to Swaim, the injury to Russell's spinal cord in his neck would "definitely" cause his current symptoms, including "pain in the back, pain in the left side of the arm." "You might have weakness in your legs. Might have burning in your feet." He acknowledged that Russell was released from the hospital one day after neck surgery and required no pain medication "due to not having any pain." Swaim

conceded that the surgeon had removed "degenerative disc material." His report noted that the MRI six days after the collision showed "degenerative disc disease" as well as the "disc bulging" and "disc protrusion."

Even after Russell's neck surgery, an MRI showed "persistent" damage that Swaim believed could cause his "ongoing discomfort" and "shocking sensation" in his legs and feet. He believed Russell would need another neck surgery. He acknowledged that a physical therapist noted in June 2014 that Russell had restored his range of neck motion to normal.

As for Russell's back, Swaim testified that an MRI showed a painful disc herniation caused by the collision. After a scheduled break, the court gave a "limiting instruction" that Swaim was not at the accident and the jury, not the doctor, must ultimately decide if the accident caused the injuries.

Swaim acknowledged that three of Russell's treating doctors characterized the back condition as a "small," "mild," and "normal" disc bulge, not a harmful disc herniation. A fourth doctor found "no obvious abnormality" in Russell's back to explain his reported symptoms. An MRI five months after the collision showed his back, including the spine and soft tissue, within normal limits. A CT scan seven months after the collision showed no compressions or problems with scoliosis. Swaim conceded that a disc problem shown in the CT scan "can happen as a normal process of aging." He acknowledged Russell had also complained of pain in other parts of his back unrelated to the collision.

As for Russell's right shoulder, Swaim testified that the collision caused the rotator cuff to become frayed, requiring the surgery in December 2014. Russell's doctor found the shoulder "normal" in an MRI two months after the collision. Yet another MRI showed no abnormalities six months after the collision. However, Swaim

believed that another MRI showed an injury creating Russell's reported discomfort, the "popping," and difficulty using his right shoulder.

Swaim acknowledged that this shoulder injury could occur in people whose jobs required a lot of overhead lifting or rotating. He testified Russell "might have had some rotator cuff issue because he's a worker," but the collision "either caused or was a substantial contributing factor to cause" the injury. The court again commented to the jury that the question of causation was ultimately up to them.

Russell testified that his injuries from the collision forced him to change jobs because he could no longer do physical labor. Before, he owned a home renovation company where, he said, "I physically did all that work myself," including carrying concrete, framing walls, and setting toilets. He also worked as a construction superintendent, "very demanding," "almost all labor." He had to "stack all the lumber" and tidy up the job site. After the collision, he claimed he could no longer perform that work.

According to Russell, he sought construction work with fewer physical demands but could not keep a job due to the pain in his neck, back and shoulder. At four successive jobs, he was fired or left because he argued with his bosses. According to Russell, his last boss told him, "Even when you say something nice, you come off like you're a real jerk. . . . Your face. It always looks angry." Russell testified he was "grumpy all the time and argumentative" because pain prevented him from sleeping or being comfortable at work. He could not cope with the pain at work because he "was putting in just crazy hours" and "working seven days a week." He could not do any physical labor, and desk work required him to sit in a chair for too long, causing neck discomfort.

Swaim believed Russell should be restricted to light-to-medium work, limiting lifting. However, Russell was "unaware of being placed on any official permanent

work restrictions" by his treating doctors. Swaim acknowledged that by eight months after the collision, Russell's neck flexibility was "within normal limits" and his arm strength was "normal." He could walk without any nerve problems in his heels. According to Swaim's report, Russell's doctor, after both surgeries, found normal range of motion in his neck and back.

As for hobbies, Russell testified that before the collision, he did "P90X, which is a pretty rigorous workout program. . . . twice a day." He also worked on motorcycles. "Getting those bikes on and off the lift is pretty tough," he told the jury. "Taking the motor apart, when you're working on a bike . . . you're constantly kind of leaning out, reaching inside the motor." He said the pieces are "heavy."

However, Hargis testified that since the collision, Russell had never "complained about any pain or anything" to him. Russell himself admitted on cross-examination that he could still work on motorcycles afterward, and had built another one.

Russell acknowledged numerous prior injuries. He injured his neck in a car crash in 1984, requiring chiropractic treatment. He injured his neck, back, and arms in two car crashes in the early 1990s, again requiring chiropractic treatment. He had two ACL replacement surgeries between 2000 and 2007. Importantly, in 2011, two years before the collision, he crashed his motorcycle into a car and fell to the ground, injuring his hands, wrists, and foot. His doctor told him to "back off" his P90X workout routine. Russell disputed whether his doctor also told him to stop motocross racing.

Swaim conceded that Russell had medical issues unrelated to the collision. Russell was diagnosed with anxiety disorder, a bowel inflammatory disease, and gastroesophageal reflux disease. Swaim said gastroesophageal reflux disease could wake Russell up at night. He also had chronic low back pain, a history of concussion, and doctors' visits for wrist pain. Swaim's summary of Russell's medical records,

admitted into evidence, noted hand and arm injuries from falling down stairs at work in 2006, including a right-elbow fracture. In 2012, the year before the collision, Russell complained to his doctor of pain in his hands, wrists, and feet. Swaim also admitted that Russell had not disclosed the 2011 motorcycle crash to him during the medical evaluation.

The district court, before trial, entered partial summary judgment on liability because Anderson admitted that crossing the center line was negligent. Anderson also admitted that crossing the center line caused the collision, but disputed whether it caused Russell's injuries.

In closing, Anderson argued that the collision caused Russell to be only "stiff and sore," and therefore Russell should receive an award only for "his treatment almost immediately after the accident." According to Anderson, that included a few chiropractor visits and imaging, "and those services total $6,969." But if the jury believed the neck disc herniation was related to the accident, Anderson said "the relevant medical bills total $125,006.18."

The jury awarded Russell $7,000. The district court denied Russell's motion for a new trial. Russell appeals, arguing (1) the district judge erred by three comments to the jury; (2) the damages verdict was against the weight of the evidence; (3) the court erred by ruling on his loss-of-earning-capacity claim; and (4) the court abused its discretion by excluding evidence that Sheriff Weeks did not issue a traffic citation to Anderson. This court reviews for abuse of discretion a district court's denial of new trial. *Lincoln Composites, Inc. v. Firetrace USA, LLC*, 825 F.3d 453, 459 (8th Cir. 2016).

II.

Russell argues that the district court erred in three comments to the jury. He asks that this court review them for abuse of discretion. However, because he did not object at trial, this court reviews only for plain error. *See **Rush v. Smith***, 56 F.3d 918, 922 (8th Cir. 1995) (en banc) (reviewing district court's comments for plain error, because error was "not identified by a contemporaneous objection"). Russell asserts that at an off-the-record conference, the district court threatened to give the second "limiting instruction,"[2] but he does not assert that he objected. Russell relies on his counsel's description of the conference in his memorandum supporting his new trial motion and his brief on appeal. These are not sufficient objections. *See **id.***; ***Alger v. Hayes***, 452 F.2d 841, 845 (8th Cir. 1972) (reviewing district court's comments "made throughout the trial" for plain error because party failed to object "at the time they were made"). *Cf.* **Fed. R. Civ. P. 51(c)(1)**, **(2)(B)** (requiring a party to object to a jury charge "on the record, stating distinctly the matter objected to and the grounds for the objection," "promptly after learning that the instruction . . . will be, or has been, given"); **Fed. R. Evid. 614(c)** ("A party may object to the court's calling or examining a witness either at that time or at the next opportunity when the jury is not present.").

Plain error exists when there is (1) an error; (2) that is plain; and (3) affects substantial rights. ***United States v. Pirani***, 406 F.3d 543, 550 (8th Cir. 2005) (en banc)*, citing **United States v. Olano***, 507 U.S. 725, 732-36 (1993). This court may

---

[2]Although the district court and the parties refer to all three of the judge's comments as "limiting instructions," a limiting instruction restricts the purposes for which the jury can consider evidence. *See **Crane v. Crest Tankers, Inc.***, 47 F.3d 292, 294 n.3 (8th Cir. 1995)*, citing* **Fed. R. Evid. 105** (When a court admits evidence admissible only for a certain purpose, "the court, on timely request, must restrict the evidence to its proper scope and instruct the jury accordingly."). Here, the district court did not instruct the jurors that Swaim's testimony was admissible only for a limited purpose. *See* **Fed. R. Evid. 704** (allowing experts to testify on ultimate issues).

exercise its discretion to reverse plain error "only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* *See generally Wiser v. Wayne Farms*, 411 F.3d 923, 927 (8th Cir. 2005) (holding "an unpreserved error in the civil context must meet at least the *Olano* standard to warrant correction").

## A.

On direct examination of Swaim, Russell asked: "[T]he crash was on August 9th and then this MRI we're looking at was five days later. How does that correlate into your causation conclusion?" Anderson objected. The court overruled the objection.

Swaim answered, "It's a proximate relationship. This is not something he would be walking around with. If . . . the chicken coop's burning and your little brother's standing there with the matches, then it's pretty much that your little brother started the fire. Well, he was in an accident and . . . these symptoms and this MRI scan, the likelihood of the . . . motorcycle/vehicle accident resulting in this is extremely high. It's so high any other thing would be . . . one in a hundred thousand or something that it wouldn't have been."

Anderson objected that "post hoc analysis cannot be . . . helpful to the trier of fact," citing Federal Rule of Evidence 702. *See* **Fed. R. Evid. 702(a)** (requiring that experts help the trier of fact understand the evidence or determine a fact in issue). He moved to strike Swaim's answer. The court overruled the objection. It then commented to the jury that "the question of whether or not the automobile accident caused . . . is ultimately up to you and, with due respect to the doctor, not up to the doctor."

Russell then asked Swaim, "And, Doctor, just to be clear, in your opinion, to a reasonable degree of medical certainty, did the automobile collision . . . cause the disc

-10-

herniation . . . that you're seeing on these MRIs?" The court overruled another objection by Anderson. Swaim replied, "Absolutely."

Later that day, when Swaim testified about the injured disc in Russell's back, Russell asked, "Is it your opinion, to a reasonable degree of medical certainty, that the August 9th collision caused the . . . disc protrusion?" Swaim answered, "Yes." Anderson objected for lack of foundation because Swaim was "engaging, again, in post hoc analysis that this MRI was taken after the accident and, therefore, it caused it." The court overruled the objection. Swaim continued testifying about the back injury.

After the 15-minute afternoon break, the court told the jury, "I want to give you a limiting instruction. I'm letting the doctor talk generally about what he thinks was the cause of . . . what you're seeing on these slides. He wasn't there. It's up, ultimately, to you to decide what, if anything related to this accident, caused the alleged injuries. It's not for the doctor to make that determination."

When Swaim later testified about Russell's shoulder surgery, Russell asked, "And was . . . the condition that necessitated the surgery . . . caused, in your opinion to a reasonable degree of medical certainty, by the August 9th automobile/motorcycle collision?" Anderson objected for lack of foundation and because the testimony sought was "not helpful to the trier of fact, again engaging in post hoc analysis." The court overruled the objection. It commented to the jury a third time: "But, once again . . . it's ultimately up to you to determine causation. The physician in this case can give you his opinion, which you are entitled to accept, reject, in whole or in part."

Swaim resumed testifying about the shoulder injury. After another objection by Anderson, also overruled, Swaim said the collision "either caused or was a substantial contributing factor to cause" the shoulder injury. Russell asked if he "wouldn't have

needed the surgery, in your opinion . . . had the crash not occurred?" Swaim replied, "Correct." Anderson again objected. The court overruled the objection.

Russell asked a series of questions summarizing Swaim's causation opinions. He asked whether the neck disc herniation was "caused by any kind of disease process or illness?" Swaim answered, "No." Anderson objected. The court overruled the objection. Russell asked, "And, again, was the [neck] herniation . . . that you saw, in your opinion, caused by the August 9th motorcycle/car collision?" Swaim answered, "Yes." Anderson again objected. The court overruled the objection.

Russell said, "And then let me ask you the same questions" about the back MRI. "[W]as the damage or the disc bulge/herniation that we looked at previously the result of any disease process or illness?" Anderson objected. The court overruled the objection. Swaim answered, "No." Russell asked, "And was, in your opinion, the [back] disc bulge or herniation that we talked about previously caused by the August 9th car/motorcycle collision?" Anderson again objected. The court overruled the objection. Swaim answered, "Yes."

B.

A court may exercise "proper control" over presentation of witness testimony. *Farmers Co-op Co. v. Senske & Son Transfer Co.*, 572 F.3d 492, 500 (8th Cir. 2009). "The trial court has broad discretion in commenting on evidence and may do so in order to give appropriate assistance to the jury. The only limitation on this discretion is that the comments must not preclude a fair evaluation of the evidence by the jury." *Reed v. Malone's Mech., Inc.*, 765 F.3d 900, 910 (8th Cir. 2014) (internal citations omitted). When reviewing for plain error, this court "will reverse only when a judge's comments were so pervasive as to affect the outcome of the trial and result in a miscarriage of justice." *Bunting v. Sea Ray, Inc.*, 99 F.3d 887, 889-90 (8th Cir. 1996).

-12-

The district court's third comment reflects the proper roles of the expert witness and jury. Swaim's role as an expert was to use his "specialized knowledge" to "help the trier of fact to understand the evidence or to determine a fact in issue." *See* **Fed. R. Evid. 702(a)**. As the district court noted, the issue of causation was ultimately up to the jury. *See* **Baldwin v. City of Omaha**, 607 N.W.2d 841, 852 (Neb. 2000) ("Determination of causation is ordinarily a matter for the trier of fact.") (upholding causation finding by district court in bench trial). As for any witness, the jury could accept or reject Swaim's testimony, in whole or in part. *See* **United States v. Felix**, 996 F.2d 203, 207 (8th Cir. 1993) ("The jury is free to believe or to reject any witness's testimony in its entirety. The jury is free also to accept one or more witnesses's testimony only in part and thereby to create its own version of the facts."); ***Ratliff v. Schiber Truck Co., Inc.***, 150 F.3d 949, 954 (8th Cir. 1998) (holding party did not need to rebut expert opinion on ultimate issue because "the jury was free to accept or reject the expert testimony").

Russell argues that the district court's three comments went beyond defining the expert's role and caused the jury to reject "everything" Swaim said, by signaling that the court did not agree with him and thus the jury should not accept Swaim's opinion. In its first comment, the court unnecessarily remarked that causation "is . . . with due respect to the doctor, not up to the doctor." In its second comment, the court similarly discounted Swaim as a witness by remarking, "It's not for the doctor to make that determination." The issue, on plain error review, is whether in context, the remarks about Swaim destroyed the overall fairness of the trial. *See* ***Harris v. Steelweld Equip. Co., Inc.***, 869 F.2d 396, 403 (8th Cir. 1989).

During a full day of testimony from Swaim, the court commented on causation only three times—during his repeated statements that Russell's neck, back, and shoulder injuries resulted from the collision. *See id.* at 401-02 (holding district court did not unduly disrupt testimony by instructing witness multiple times not to volunteer

-13-

testimony). *Cf. **Champeau v. Fruehauf Corp.**,* 814 F.2d 1271, 1275-76 (8th Cir. 1987) (holding that district court prejudiced parties because interfering with their expert's testimony 145 times "likely confused the jury or led them to believe that the court found appellees' expert's testimony incomprehensible"). Each time, the court allowed Swaim to continue testifying, explaining how he reached his conclusions. *See **Harris**,* 869 F.2d at 402-03 (holding that district court did not cause prejudice by questioning expert because it allowed him to present his opinion). The court did not repeat the comments during the concluding morning's testimony, even when Swaim repeated his opinion on causation. *See **Cowens v. Siemens-Elema AB**,* 837 F.2d 817, 824 (8th Cir. 1988) (holding, on plain error review, that district court's comments were not prejudicial, in the context of a lengthy trial, when the court elaborated on its "reservations" about expert's small statistical sample size and interrupted witnesses' narrative responses and colloquies with counsel). In this context, the comments were not plain error. *See **Harris**,* 869 F.2d at 403 (holding, on plain error review, that district court's "comments and questions concerning the witnesses and evidence, when read in context, did not destroy the overall fairness of the trial"); ***Bunting**,* 99 F.3d at 889-90 (holding, "Although some of the trial judge's statements may have been unnecessary . . . the comments do not rise to the level of plain error," after reviewing "the context in which each of the challenged statements were made").

Russell contends that the district court "magnified" any prejudice from the comments by barring Swaim from testifying on whether he believed "anything in the medical record" was "inconsistent" with his causation conclusion. Barring the testimony did not preclude the jury from fairly evaluating the consistency of the testimony and the medical records that were in evidence. *See **Butler v. United States**,* 317 F.2d 249, 264-65 (8th Cir. 1963) (presuming jury "was able to and did comprehend and appraise" all the evidence in a protracted, multi-defendant trial). *Cf. **Rodriguez v. Riddell Sports, Inc.**,* 242 F.3d 567, 577 (5th Cir. 2001) (upholding jury award despite factual error in jury charge because the court of appeals must "assume the jury considered all the evidence in reaching its decision"). To the extent the district

court erred in barring Swaim's testimony on consistency, the error was harmless. *See Porchia v. Design Equip. Co.*, 113 F.3d 877, 881 (8th Cir. 1997) ("Obviously, any error which might arise from the exclusion of evidence is harmless where the same facts are presented to the jury through other evidence.").

Russell argues that by repeating the comments three times, the court signaled that it did not agree with Swaim, making it appear biased. This court "will only vacate a jury verdict for alleged trial misconduct if the record discloses that the judge was actually biased or the judge's remarks projected the appearance of advocacy or partiality." *Farmers Co-op*, 572 F.3d at 499. Because Russell did not object to the district court's comments at trial, this court reviews his claim of bias for plain error. *See Mitchell v. Kirk*, 20 F.3d 936, 937 (8th Cir. 1994) (per curiam) (reviewing for plain error an unpreserved claim of judicial bias by comments at trial).

At the outset of trial, the district court instructed the jury, "You should not take anything I may say or do during the trial as indicating what I think of the evidence or what I think your verdict should be." *Russell*, 2019 WL 3358702, at *2. In the final jury charge, the court similarly instructed, "Neither in these instructions nor in any ruling, action or remark that I have made during the course of this trial have I intended to give any opinion or suggestion as to what your verdict should be." *Id. See Reed*, 765 F.3d at 911-12 (holding that trial court's comments did not preclude "a fair evaluation of the evidence by the jury" because the jury charge included a similar instruction that the court did not intend its remarks to suggest what the verdict would be). In the context of these instructions, the three comments do not plainly show advocacy or partiality. *See Williams v. Fermenta Animal Health Co.*, 984 F.2d 261, 264 (8th Cir. 1993) (holding district court did not plainly err by making improper comment on evidence because the comment "did indicate some deference to the jury's recollection of the evidence" and was supported by jury charges that "repeatedly directed the jury not to consider comments by the court in deliberations because such comments were not intended to suggest any opinion as to any issue in the case");

-15-

***Kostelec v. State Farm Fire & Cas. Co.***, 64 F.3d 1220, 1230 (8th Cir. 1995) (holding that district court did not plainly err when record showed no evidence of judicial bias).

Russell emphasizes cases about repetitious jury charges under Rule 51. *See* ***Rosebud Sioux Tribe v. A & P Steel, Inc.***, 733 F.2d 509, 518-19 (8th Cir. 1984) (stating trial court erred by giving repetitious jury charge, but not ruling on prejudice); ***Dobson v. Bacon Transport Co.***, 607 F.2d 805, 807-08 (8th Cir. 1979) (holding a repetitious instruction was not prejudicial when viewed in the context of the entire jury charge); ***Tribble v. Westinghouse Elec. Corp.***, 669 F.2d 1193, 1198-99 (8th Cir. 1982) (same); ***Vaidyanathan v. Seagate US LLC***, 691 F.3d 972, 977 (8th Cir. 2012) (holding that district court abused its discretion by issuing jury charge that did not fairly and adequately represent the law). Russell's premise is wrong. Rule 51 addresses the final jury charges, allowing a party to file at "the close of the evidence . . . written requests for the jury instructions it wants the court to give." ***Id.* 51(a)(1)**. *See generally* **Fed. R. Civ. P. 51 advisory committee's note (discussing 1987 amendments)** (Rule 51 allows "the court discretion to instruct the jury either before or after argument" giving "counsel the opportunity to explain the instructions" to the jury.). The advisory committee's note refutes Russell's approach: "Scope: Rule 51 governs instructions to the trial jury on the law that governs the verdict. A variety of other instructions cannot practicably be brought within Rule 51. Among these instructions are . . . cautionary or limiting instructions delivered in immediate response to events at trial." ***Id.* (discussing 2003 amendments)**. The cases Russell relies on for repetitious jury charges do not govern the disputed comments.

The district court did not plainly err by its three comments.

## III.

Russell argues that the $7,000 verdict was against the weight of the evidence because no reasonable juror could find that the collision did not cause his neck disc

herniation.[3] Although the verdict did not itemize damages, the jury apparently awarded damages only for Russell being "stiff and sore" immediately after the collision, and not his neck surgery. Anderson told the jury in his closing argument that if "you believe that Mr. Russell was stiff and sore after the accident, what I believe that you should give him is his treatment almost immediately after the accident. He goes to the chiropractor a couple of times and the chiropractor does send him for imaging. . . . those services total $6,969." In contrast, if the neck herniation was related to the accident, Anderson said "the relevant medical bills total $125,006.18."

"When the basis of the motion for a new trial is that the jury's verdict is against the weight of the evidence, the district court's denial of the motion is virtually unassailable on appeal." *Lincoln Composites*, 825 F.3d at 459. "A district court abuses its discretion in denying a motion for new trial based on sufficiency of the evidence if the verdict is against the weight of the evidence and allowing it to stand would result in a miscarriage of justice." *Id.* (cleaned up). In a diversity action, "whether the jury's verdict was against the great weight of the evidence is judged in accordance with substantive state law." *Bank of Am., N.A. v. JB Hanna, LLC*, 766 F.3d 841, 851 (8th Cir. 2014).

"An award of damages may be set aside as excessive or inadequate when, and not unless, it is so excessive or inadequate as to be the result of passion, prejudice, mistake, or some other means not apparent in the record." *Bedore v. Ranch Oil Co.*, 805 N.W.2d 68, 86 (Neb. 2011). "The amount of damages to be awarded is a determination solely for the fact finder, and the fact finder's decision will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved." *Aon Consulting, Inc. v. Midlands Fin. Benefits, Inc.*, 748 N.W.2d 626, 635 (Neb. 2008). "In awarding

---

[3]On appeal, Russell does not argue that the verdict was against the weight of the evidence for his claim for his injured back and shoulder.

damages, the fact finder is not required to accept a party's evidence of damages at face value, even though that evidence is not contradicted by evidence" cited by the opposing party. ***Springer v. Bohling***, 643 N.W.2d 386, 395 (Neb. 2002). "Generally, a jury is entitled to determine what portion of a claimed injury was proximately caused by the incident and what portion of the medical bills was reasonably required." ***Id.*** The key is whether a jury "reasonably can find that damages were proximately caused by the tortious act." ***David v. DeLeon***, 547 N.W.2d 726, 730 (Neb. 1996). It "is virtually impossible to 'color match' cases to determine whether a verdict in a particular case was adequate." ***Poppe v. Siefker***, 735 N.W.2d 784, 792 (Neb. 2007).

Russell asserts that "[e]very piece of evidence" at trial supports "beyond any doubt" the conclusion that the collision caused his neck disc herniation. This is not true.

This court views "the evidence in the light most favorable to the jury verdict, assuming as true all facts which the prevailing party's evidence tended to prove." ***Patterson***, 779 F.3d at 801 (upholding denial of new trial because jury's award of nominal damages was consistent with evidence most favorably to the verdict) (cleaned up). *See also* ***Inacom Corp. v. Sears, Roebuck & Co.***, 254 F.3d 683, 689 (8th Cir. 2001) (upholding denial of new trial based on weight of evidence for jury verdict on Nebraska law claim). "When reviewing the sufficiency of the evidence to sustain a judgment" on appeal, Nebraska courts are "mindful that every controverted fact must be resolved in favor of the successful party, and such party is entitled to the benefit of every inference that can reasonably be deduced from the evidence." ***Baldwin***, 607 N.W.2d at 852 (upholding causation finding by district court in bench trial).

Russell himself testified that when Anderson's vehicle hit him, he stayed on his motorcycle, restarted it, got it back into gear, and drove out of a ditch. He was not bleeding and at the time did not think anything was broken. He testified, "I actually kind of patted myself down and thought, 'Well, I think I'm alright.'" According to

-18-

Russell, Anderson said, "Glad you're okay." Russell replied, "I'm glad you're okay, too." Russell, a licensed emergency medical technician, did not request an ambulance because "I didn't feel, at the time, that I needed one." The jury could give weight to his perceptions at the collision scene.

Nor did other witnesses see signs of a neck injury on Russell at the scene. His friend, Sherman, saw him "throwing his arms up and down," "pacing around" waiting for police to arrive. Sherman did not recall Russell complaining of injuries that night. Sheriff Weeks did not see any injuries on Russell, who "seemed normal." Weeks did not call an ambulance because Russell "said he . . . was not injured enough for any treatment." Russell told him only, "I may have hurt my arm a little bit." If Russell's injuries had impaired his driving ability, Weeks said he "wouldn't have let him drive."

The jury also could believe Russell's own testimony about riding his motorcycle 50 miles to a hotel after the collision, and another four hours home the next day. During the trip home, Hargis and Sherman did not see him having "any problems operating his bike." Sherman did not recall him asking to take a break.

The jury also heard evidence that the collision did not severely damage Russell's motorcycle, suggesting it was not severe. Weeks testified that he saw some scratches along the side, but recalled no other damage. He said he would not have let Russell drive an inoperable motorcycle away from the collision. When Russell was unsure it could be ridden, Sherman, a mechanic, after riding it about 200 feet, said, "No, it's fine. You'll be alright." Russell rode it, without repairs, 50 miles to the hotel that night and four hours home the next morning.

True, Dr. Swaim's report noted that a physician's assistant observed the "fresh" neck disc herniation in the MRI six days after the collision. However, the jury could give weight to evidence that something other than the collision caused the neck injury and related symptoms, including pain, weakness in extremities, and "burning feet."

-19-

Russell described his work and hobbies as "physical labor." For his home construction business, "I physically did all that work myself," including carrying concrete, framing walls, and setting toilets. His construction superintendent work was also "very demanding" and "almost all labor." He had to "stack all the lumber" and tidy up the job site. As for hobbies, before the collision he did "P90X, which is a pretty rigorous workout program. . . . twice a day." He also worked on motorcycles, telling the jury, "Getting those bikes on and off the lift is pretty tough. Taking the motor apart, when you're working on a bike . . . you're constantly kind of leaning out, reaching inside the motor." He said the pieces are "heavy."

The jury also heard evidence of many past injuries and medical conditions that could have caused Russell's symptoms. He was in three car crashes in the 1980s and early 1990s that injured his neck, back, and arms—all requiring chiropractic treatment. In 2011, two years before the collision, Russell crashed his motorcycle into a car and fell to the ground, injuring his hands, wrists, and foot. His doctor told him to "back off" his P90X workout routine. The jury could believe that his doctor also told him to stop motocross racing. Although Russell testified that his neck injury woke him up at night with pain, Dr. Swaim conceded that Russell's gastroesophageal reflux disease could also do that. Russell also had chronic low back pain, a history of concussion, and doctors' visits for wrist pain. Swaim's report noted that he injured his hands and arms from falling down stairs at work in 2006. The year before the collision, Russell complained to his doctor of pain in his hands, wrists, and feet. The jury could believe these medical issues caused the symptoms he blamed on the collision.

Although Russell claimed he required another neck surgery, the jury heard evidence that his symptoms had improved. Swaim acknowledged that eight months after the collision, Russell's neck flexibility was "within normal limits" and his arm strength was "normal." He could walk without any nerve problems in his heels. According to Swaim's report, Russell's doctor found normal range of motion in his neck and back in May 2015.

The jury also heard evidence undermining Russell's and Swaim's credibility. According to Swaim, Russell did not disclose the 2011 motorcycle crash in his independent medical evaluation. Swaim acknowledged that despite the claimed physical limitations, Russell was "unaware of being placed on any official permanent work restrictions" by his treating doctors. Although Russell said he could no longer do physical labor, he conceded he could still work on motorcycles, and had built another one. Hargis testified that since the collision, Russell had never "complained about any pain or anything" to him.

The jury could also discount Russell's and Swaim's credibility because both men claimed the collision injured Russell's back, despite contrary evidence. (Recall that Russell does not appeal the lack of damages for injuries to his back and shoulder.) Although Swaim testified that the collision caused a disc bulge, three doctors treating Russell characterized the disc bulge as "small," "mild," and "normal." A fourth doctor found "no obvious abnormality" in Russell's back to explain his claimed symptoms. In a January 2014 MRI, Russell's doctor found his back, including the spine and soft tissue, within normal limits. A March 2014 CT scan showed no compressions or scoliosis problems. Swaim conceded that any disc problem found in the scan "can happen as a normal process of aging." He acknowledged that Russell had also complained of pain in other parts of his back unrelated to the collision.

Likewise, Russell's and Swaim's claims that the collision injured Russell's right shoulder—in the face of contradictory evidence—also undermined their credibility. Two months after the collision, in October 2013, Russell's doctor found his shoulder "normal" in an MRI. A February 2014 MRI showed no abnormalities. He did not have shoulder surgery until December 2014, sixteen months after the collision. Swaim admitted that the shoulder injury could occur in people whose jobs required a lot of overhead lifting or rotating and Russell "might have had some rotator cuff issue because he's a worker."

The award of $7,000 bears a reasonable relationship to the damages proved. The verdict is not against the weight of the evidence. The district court did not abuse its discretion in denying the motion for new trial.

IV.

Russell argues that the district court erred by dismissing his loss-of-earning-capacity claim. In discovery, Anderson requested his income tax returns. Russell responded, "Irrelevant and immaterial. Plaintiff is not making a claim for lost income or lost wages (past or future) and is [sic] therefore irrelevant and immaterial to the pending case." At trial, Russell offered evidence of his pre-collision wages. Anderson moved to strike it. The district court made "two independent and separate findings": Russell's discovery response was a "judicial admission" barring evidence of his past wages; and, without a pre-collision "starting point," the jury could not calculate Russell's loss of earning capacity. Reasoning that any award would be "sheer speculation," the court did not let Russell present the loss-of-earning-capacity claim to the jury.

A.

Anderson argues the discovery response was a judicial admission that Russell did not claim loss-of-earning-capacity damages. This court reviews de novo "whether a particular statement constitutes a judicial admission." *Estate of Korby v. Comm'r*, 471 F.3d 848, 852 (8th Cir. 2006). A "judicial admission must be deliberate, clear, and unambiguous." *Acciona Windpower N. Am., LLC v. City of W. Branch*, 847 F.3d 963, 968 (8th Cir. 2017) (holding that poorly worded statement was not an unambiguous admission). A "carelessly worded" statement "is not a deliberate, clear, and unambiguous concession." *Grandoe Corp. v. Gander Mountain Co.*, 761 F.3d

876, 885 (8th Cir. 2014) (holding, based on context, that stipulation was not a judicial admission).

Russell's discovery response stated he was not claiming lost wages. A claim for lost wages is "separate and distinct" from a claim for loss-of-earning capacity. *Siciunas v. Checker Cab Co., Inc.*, 217 N.W.2d 824, 826 (Neb. 1974). "Loss of past earnings is an item of special damage and must be specifically pleaded and proved. An impairment of earning capacity is an item of general damage and proof may be had under general allegations of injury and damage." *Id.* By stating he did not claim lost wages, Russell did not deliberately and clearly state he did not claim any loss-of-earning-capacity damages. *Cf. ACI Worldwide Corp. v. Churchill Lane Assocs., LLC*, 847 F.3d 571, 577 n.2 (8th Cir. 2017) (refusing to extend scope of judicial admission).

Also, Russell's pleadings, discovery responses, and testimony are ambiguous about damages for loss-of-earning capacity. Although Russell's complaint did not expressly claim damages for loss-of-earning capacity, they could be included in general damages. *See Siciunas*, 217 N.W.2d at 826. Anderson's counsel, deposing Russell, said, "It's my understanding that what you are pursuing is what's called a loss-of-earning capacity." Russell did not disagree, explaining he could no longer do the physical labor for his home renovation company. In response to interrogatories, he answered twice that he "is not claiming any specific lost wages or income as a result of this accident," but added in the next sentence, he "does claim that injuries caused by this vehicular accident . . . continues [sic] to interfere with his employment and ability to work and believes his injuries will continue to interfere with his ability work [sic] in the future." When Anderson asked Russell to clarify these answers, Russell's counsel explained, "The crash has diminished Plaintiff's ability to work in the future but plaintiff does not have any specific dollar amount for that loss at this time." Because Russell did not deliberately, clearly, and unambiguously state he did not claim loss-of-earning-capacity damages, he did not make a judicial admission. *See Choice*

*Escrow & Land Title, LLC v. BancorpSouth Bank*, 754 F.3d 611, 625 (8th Cir. 2014) (holding that ambiguous concession in complaint was not a judicial admission).

The district court alternatively ruled that Russell needed to present a pre-collision "starting point" in order to calculate his loss-of-earning capacity. To the contrary: "Proof of an actual loss of earnings or wages is not essential to recovery for loss of earning capacity." *Washington v. Am. Cmty. Stores Corp.*, 244 N.W.2d 286, 289 (Neb. 1976). The district court's stated rationales were wrong.

B.

This court reviews "a district court's decision to exclude evidence for a clear and prejudicial abuse of discretion." *May v. Nationstar Mortgage, LLC*, 852 F.3d 806, 819 (8th Cir. 2017). "Unless justice requires otherwise, no error in . . . excluding evidence . . . is ground for granting a new trial. . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." **Fed. R. Civ. P. 61**. This court will not reverse a denial of new trial for excluding evidence when the exclusion did not prejudice the movant "to an extent resulting in fundamental fairness." *Amplatz v. Country Mut. Ins. Co.*, 823 F.3d 1167, 1172 (8th Cir. 2016). This court will disturb the judgment only if "it is likely that the jury would have been substantially swayed by the wrongly excluded testimony if it had been admitted." *Hall v. Arthur*, 141 F.3d 844, 849-50 (8th Cir. 1998) (holding that erroneously excluding evidence was not reversible error because jury would not have been substantially swayed). *See also* **28 U.S.C. § 2111** (requiring courts of appeals to "give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties").

For a loss-of-earning-capacity claim, the fact-finder must determine (1) "the extent to which such capacity has been diminished;" (2) "the permanency of the decrease in earning capacity;" and (3) "the amount of money which will compensate

for the determined extent and length of the impairment." ***Snyder v. Case***, 611 N.W.2d 409, 417 (Neb. 2000). The jury awarded Russell damages only for being temporarily "stiff and sore" immediately after the collision, not for the conditions requiring his neck surgery or any future neck surgery. Because the jury found Russell was only temporarily injured by the collision, no reasonable jury would have found permanent impairment and diminution of his future earning capacity. *See **Holmes v. Crossroads Joint Venture***, 629 N.W.2d 511, 525-26 (Neb. 2001) (holding district court did not abuse its discretion in ruling that verdicts were not supported by the evidence when plaintiff recovered from a brief injury and suffered no loss-of-earning capacity); ***Shipler v. Gen. Motors Corp.***, 710 N.W.2d 807, 839 (Neb. 2006) (noting that "uncertainty as to the fact of whether damages were sustained at all is fatal to recovery"); ***Amplatz***, 823 F.3d at 1173 (holding that excluding evidence of additional interior damage did not prejudice plaintiff because jury rejected claim "to any interior damage whatsoever"). The district court's abuse of discretion by excluding evidence of Russell's past wages was harmless.

## C.

Russell argues the district court erred by granting judgment on his loss-of-earning-capacity claim during trial. A court may grant judgment as a matter of law on a claim during a jury trial when (1) "a party has been fully heard on an issue;" (2) "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue;" (3) the court resolves the issue against the party; and (4) a favorable finding on that issue is necessary for the claim. **Fed. R. Civ. P. 50(a)(1)**.

When the district court dismissed the loss-of-earning-capacity claim, Russell was still presenting evidence and could have testified further about his "age, life expectancy, health, habits, occupation, talents, skill, experience, training, and industry." *See **Uryasz v. Archbishop Bergan Mercy Hosp.***, 431 N.W.2d 617, 623 (Neb. 1988) (the quoted factors may support recovery for loss-of-earning capacity).

-25-

*See also Wortman v. Nw. Bell Tel. Co.*, 240 N.W.2d 15, 17 (Neb. 1976) (holding plaintiff's lay testimony on the loss-of-earning-capacity factors was sufficient evidence); *Washington*, 244 N.W.2d at 289 (holding evidence was sufficient for loss-of-earning-capacity claim even without past wages in expected profession); *Chirnside v. Lincoln Tel. & Tel. Co.*, 401 N.W.2d 489, 493 (Neb. 1987) (holding evidence was sufficient for loss-of-earning-capacity claim for 8-year-old even without past wages). The district court erred in dismissing the loss-of-earning-capacity claim during trial.

The district court's error was harmless. "Unless justice requires otherwise, no . . . error by the court . . . is ground for granting a new trial. . . . At every stage of the proceeding, the court must disregard all errors and defects that do not affect any party's substantial rights." **Fed. R. Civ. P. 61**. *See* **28 U.S.C. § 2111** (same).

The jury believed Russell was only temporarily "stiff and sore" after the collision. The verdict shows that Russell was not significantly injured from the collision. *See Cavataio v. City of Bella Villa*, 570 F.3d 1015, 1024 (8th Cir. 2009) (holding any error in granting summary judgment against plaintiff was harmless because the verdict on another claim showed the jury would have found against her on the dismissed claim); *Garner v. Missouri Dep't of Mental Health*, 439 F.3d 958, 961 (8th Cir. 2006) (holding harmless any error in denying leave to amend to add a claim because it shared elements with another claim that plaintiff lost at trial). No reasonable jury could have found permanent impairment or diminution of his future earning capacity. *See Uryasz*, 431 N.W.2d at 624 (holding that evidence failed to prove with reasonable certainty the impairment of loss-of-earning capacity because "the extent and permanence of that impairment" were speculative and uncertain); *Holmes*, 629 N.W.2d at 525-26. The district court's erroneous grant of judgment on the loss-of-earning-capacity claim was harmless.

V.

Russell argues that the district court abused its discretion by forbidding cross-examination of Sheriff Weeks about his failure to give Anderson a traffic ticket for crossing the center line. Russell believes this evidence would show Weeks's bias for Anderson, undermining his testimony that the collision was not severe.

Evidence of bias is relevant to impeach a witness. *United States v. Abel*, 469 U.S. 45, 51 (1984). A district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury . . . wasting time, or needlessly presenting cumulative evidence." **Fed. R. Evid. 403**. "A district court's Rule 403 ruling depends on factors that are uniquely accessible to the trial judge who is present in the courtroom and uniquely inaccessible to an appellate judge who must take the case on a cold record." *Burckhard v. BNSF Ry. Co.*, 837 F.3d 848, 855 (8th Cir. 2016) (per curiam) (cleaned up). This court "may affirm evidentiary rulings on any ground supported by the record." *May*, 852 F.3d at 819. This court reviews for abuse of discretion evidentiary rulings and reverses only for "clear and prejudicial abuse of discretion." *Walker v. Kane*, 885 F.3d 535, 538 (8th Cir. 2018).

The district court did not abuse its discretion by excluding the testimony. As the district court found, the evidence was only minimally probative of bias because "not every time somebody crosses the center line do cops give tickets." Because Anderson stipulated that crossing the center line was negligent, evidence he violated a traffic law was confusing and misleading for the jury. *See Hoselton v. Metz Baking Co.*, 48 F.3d 1056, 1060 (8th Cir. 1995) (holding district court did not abuse its "broad discretion" by excluding confusing or misleading evidence on collateral issue). The evidence was also unfairly prejudicial, because Anderson stipulated to negligence. *See Firemen's Fund Ins. Co. v. Thien*, 63 F.3d 754, 759 (8th Cir. 1995) (holding district court properly excluded evidence on collateral issue because likelihood of unfair prejudice,

confusion, and waste of time outweighed its probative value); ***Easley v. Am. Greetings Corp.***, 158 F.3d 974, 976 (8th Cir. 1998) (holding that court did not abuse its discretion by excluding testimony on undisputed element). Most importantly, the evidence of bias was cumulative because Russell had already cross-examined Weeks extensively about his longstanding friendship with Anderson. *See* ***Cummings v. Malone***, 995 F.2d 817, 826-27 (8th Cir. 1993) (holding district court did not abuse its discretion by excluding prejudicial, cumulative evidence of bias).

\* \* \* \* \* \* \*

The judgment is affirmed.

_____